## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TERENCE ANDERSON                          *

    *Plaintiff,*                      *

v.

                                      *        Civil No. 21-0683-BAH

WILLIAM BEEMAN, et al.,                   *

    *Defendants.*                     *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiff Terence Anderson ("Plaintiff") brought suit against Sergeant William Thomas, Officer Corey Dolly, Officer Jason Frantz (collectively the "State Defendants," or "Defendants") and Registered Nurse William Beeman and Nurse Practitioner Holly Hoover (collectively the "Medical Defendants") alleging violations of Plaintiff's civil rights under the Eighth and Fourteenth Amendments. ECF 83, at 3 ¶ 9. Pending before the Court is the State Defendants' motion for summary judgment, ECF 111. Plaintiff filed an opposition, ECF 115, and Defendants filed a reply, ECF 118. All filings include memoranda of law and exhibits.[1] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendants' motion for summary judgment, ECF 111, is **DENIED**.

## I. BACKGROUND

### A. Procedural History

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

Plaintiff filed a pro se complaint against Beeman, Corizon Health, Dolly, Thomas, and "other officials" on March 18, 2021. ECF 1 (initial complaint). On June 29, 2021, Corizon Health filed a motion for judgment on the pleadings. ECF 15. Plaintiff did not oppose the motion and Corizon Defendants did not file a reply. On September 9, 2021, the State Defendants filed a motion to dismiss, or, in the alternative, for summary judgment. ECF 23. Plaintiff filed a declaration and opposition motion in response to Defendants' motion. ECF 25. State Defendants did not file a reply. On December 13, 2022, Judge Russell granted in part and denied in part the motion for judgment on the pleadings and the motion to dismiss, or, in the alternative for summary judgment. ECF 36. The court dismissed Corizon Health as a defendant, and dismissed Anderson's sexual assault claim, but allowed the case to proceed against the other defendants on all other claims. ECF 37.

On January 31, 2023, pro bono counsel was appointed for Plaintiff. ECF 49. On July 17, 2023, Judge Russell granted Plaintiff's motion for leave to amend the complaint.[2] ECF 64. On September 6, 2023, Judge Russell granted Plaintiff's motion for leave to file a second amended complaint.[3] ECF 82. The Second Amended Complaint is the operative complaint in this case. *See* ECF 83.

On October 18, 2023, the case was reassigned to the undersigned. The parties then engaged in discovery, including document production and depositions. *See generally* ECFs 89–105. On July 16, 2024, the State Defendants filed a motion for summary judgment. ECF 111. Plaintiff opposed the motion, ECF 115, and Defendants filed a reply, ECF 118.

---

[2] The Amended Complaint added Defendant Frantz as a party to this action. ECF 65.

[3] The Second Amended Complaint added Defendant Hoover as a party to this action. ECF 83.

## B.    Anderson's Allegations

On November 27, 2019, Plaintiff Terence Anderson was transferred to North Branch Correctional Institution ("NBCI") from another Maryland Department of Corrections facility. ECF 83, at 3 ¶ 11. Two days after this transfer, Plaintiff was in his cell when Officer Frantz allegedly pepper-sprayed him. *Id.* at 4 ¶ 14. According to the Complaint, Officer Frantz claimed that he pepper-sprayed Plaintiff "because Plaintiff had threatened to throw feces on him." *Id.* ¶ 15. Plaintiff asserts he never made such a threat, and that Officer Frantz pepper-sprayed him "because he had his arm in the feed-up slot of his cell door." *Id.;* ECF 115, at 8.

Immediately following this incident, Officer Frantz called for his supervisor, Sergeant Thomas, who handcuffed Plaintiff and led him to the medical room on Housing Unit 1 for an evaluation. ECF 83, at 5 ¶ 17. Plaintiff states that his "eyes, nose, mouth, and skin were burning and streaming bodily fluids, including tears, mucous, and saliva from the effects of the pepper spray; he had difficulty seeing and breathing; and he could not wipe his face because his hands were shackled behind his back." ECF 115, at 9 (citing ECF 115-1 (Plaintiff's Interrogatory Answers), at 6 and ECF 111-2 (Frantz Dep.), at 119–20). At one point, Plaintiff "shook [his] head to try to shake some of [the pepper spray] off." ECF 115-1, at 6. According to Plaintiff, Thomas "reacted angrily." ECF 115-2 (Anderson Decl.), at 3 ¶ 8. Officer Dolly then joined the escort. ECF 115, at 9. Plaintiff was compliant for the remainder of the escort. *Id.* at 10.

Once in the medical room, Plaintiff contends that he tried "to tell Nurse Beeman what happened," but Thomas told him to "shut up." ECF 115-1, at 6. Plaintiff's hands were "still cuffed behind [his] back." *Id.* Plaintiff alleges he was then "physically restrained and held down by Officers Dolly and Frantz," and claims that Thomas began "punching [Plaintiff] in the face with tremendous force." *Id.* at 7. Plaintiff asserts that Thomas punched him "multiple times with his gloved hand," and Plaintiff says he was eventually "knocked unconscious." *Id.* Plaintiff was

3

"bleeding out of the right side of [his] nose." *Id.* Beeman also testified that Thomas punched

Plaintiff "multiple times" while the other officers held Plaintiff down. ECF 111-6 (Beeman Dep.),

at 87–88. According to Beeman, Thomas approached Beeman after the incident and said

something like, "sorry you had to see that, I'm not usually like that." *Id.* at 216. Thomas maintains

that Plaintiff spat on him, but Plaintiff denies that he spat on or at anyone in the medical room.

ECF 115-2, at 3 ¶ 10.

Plaintiff alleges that after the assault, he was taken to a "strip cage" where he "remained

shackled for several hours before being strip searched and then taken back to the medical room for

an evaluation by Nurse Beeman." ECF 83, at 7 ¶ 31. Beeman recorded a "swollen and black and

blue right eye," and "small laceration to right side of mouth," in Plaintiff's medical records, which,

according to Plaintiff, "suggest[s] more than one punch." ECF 115-3 (Beeman Visit Note), at 29–

30; ECF 115, at 14. Plaintiff further observes that Beeman used "vague, euphemistic, and

misleading terminology in Plaintiff's medical records," in order to "cover up what happened."

ECF 83, at 7–8 ¶ 32. Following the evaluation, Beeman did not prescribe medication, order

follow-up tests or imaging, or suggest other treatment. *Id.* at 8 ¶ 33. Despite multiple requests by

Plaintiff to be treated for his facial injuries following the incident, both Beeman and Hoover

allegedly "refused to bring him to sick call for treatment or refused to see him." *Id.* at 11–12 ¶ 44.

Thomas did not report that Plaintiff spit directly on him in the Use of Force report he

submitted on the day of the event. *See* ECF 111-3 (Thomas Dep.), at 78–80 (Q: "Is there any place

in your Use of Force report where you indicate that he spit on you in the medical room?" A: "I do

not see it right here, but I can tell you that he did spit in my face.").[4] Additionally, Thomas did

---

[4] The line of questioning continues: "Q: [If] you want to find something that happened that's
important to the event to determine whether the use of force was justified, you should include all

not charge Plaintiff with spitting on him in the medical room when he charged Plaintiff with violations of NBCI rules for his conduct on that day. *Id.* at 55–56; ECF 115-3 (Notice of Inmate Rule Violation), at 24–26. When asked why he did not file an infraction against Plaintiff for spitting on him in the medical room, Thomas responded: "Probably on that day I was probably hot then. After you get spit in the face, you get pretty hot." ECF 111-3, at 56.

Plaintiff also alleges that there is evidence that Thomas was "aware of Mr. Anderson's participation in a notorious 2006 NBCI prison riot that severely injured one of the correctional officers," because "Mr. Anderson told him so just two days earlier." ECF 115-1, at 4. Additionally, Intelligence and Investigative Division (IID) records reflect that on December 4, 2019, Thomas told IID investigator Kandace Mills that "Inmate Anderson has a very extensive violation history," and has "several assaults on staff in his history." ECF 115-9 (Department of Public Safety and Correctional Services ("DPSCS") Intelligence & Investigative Division Incident Report), at 5.

Dr. Paul Manson, one of Plaintiff's experts, described Plaintiff's injury as "the type that would be seen in a high-speed auto collision, horse kick, or direct hit with a hard ball." ECF 115-8 (Manson Report), at 9. According to Dr. Manson, Plaintiff sustained "a comminuted and dislocated fracture of his right zygoma, fracture of the maxilla at the medial infra-orbital rim, and fracture of the glenoid fossa at the skull base in the temporal region." *Id.* Dr. Manson concluded, based on his education, training, and experience, that the kind of injury sustained by Plaintiff "was unlikely to have occurred from a single punch with a naked fist." *Id.* Dr. Manson further concluded, based on his "experience with zygoma fractures, [Plaintiff's] report, and [] review of

---

of the significant facts; right? A: Yes. Q: Yet, there's nowhere in your report where you indicated that he spit in your face; is there? A. No." ECF 111-3, at 80.

the CT scan," that Plaintiff "bled for a period of time from the right side of his nose," and "the injury he sustained to the area of the glenoid fossa/skull base and the magnitude of the zygoma injury are entirely consistent with Mr. Anderson's report of loss of consciousness." *Id.*

Defendants' expert, George Hardinger, testified that that punching Mr. Anderson "was not in compliance with" the Use of Force Procedures Manual that governs the conduct of correctional officers when using force against inmates. ECF 115-10 (Hardinger Dep.), at 3 (explaining that "there's nothing in the [Use of Force Procedures] manual that says that I'm authorized to punch someone other than if I'm more or less in a self-defense mode," and Thomas "was not" in such a mode). Captain Johns, Thomas's superior who investigated the use of force, agreed that any spitting or slinging of mucous or saliva could have been prevented by a spit mask, and that a spit mask is a good correctional practice and involves less force than a hard-hand punch. ECF 115-5 (Johns Dep.), at 33–38.

Plaintiff also alleges that there is "abundant evidence of a concerted cover-up," including, *inter alia*, that the Use of Force reports use "virtually identical language" to describe what happened, Captain Johns' Serious Incident Report "does not report any injury to [Plaintiff] other than pepper-spray exposure, even though he was required to document whatever injuries [Plaintiff] sustained," none of the Use of Force reports mention that Beeman was in the medical room, Beeman cannot explain why he did not report what he witnessed and gave contradictory information, no photographs were taken of Plaintiff's face even though such photos are required, there are "inexplicably no images" of Plaintiff in the strip cage, and Plaintiff "never received the further treatment he needed for his facial injuries." ECF 115, at 17–19. Plaintiff also asserts that "for much of the remainder of his incarceration," Dolly "took actions to discourage [Plaintiff] from, or to retaliate against him for, pursuing his legal claims for what happened in the medical

6

room, including threatening him, refusing to put in sick call requests, spraying mace on his legal papers, keeping his cell light on, withholding phone calls, and other kinds of harassment." *Id.* at 19 (citing ECF 115-2, at 7).

On December 2, 2019, Plaintiff was sent to Western Maryland Regional Medical Center, a medical facility outside of NBCI. ECF 115-6 (Medical Records), at 6. During his evaluation, a healthcare provider noticed Plaintiff's facial injuries and ordered a CT scan. *Id.* at 2–3. The scan revealed "a displaced right zygomaticomaxillary complex fracture." *Id.* at 3. Subsequently, the healthcare provider noted in Plaintiff's medical records Plaintiff's need for follow-up treatment. ECF 115-2, at 5 ¶ 16. Plaintiff alleges that Beeman and Hoover "knew there was a displaced zygoma fracture that needed follow-up care, but neither of them did anything to schedule or set that follow-up treatment in motion." ECF 83, at 8–9 ¶ 34; *see also* ECF 115-2, at 5 ¶ 17. Plaintiff did not receive treatment for his facial injuries for at least six months, and by then, the "bones had healed over in the wrong position." ECF 115-2, at 5 ¶ 17. Consequently, Plaintiff's face was left "disfigured," and he alleges that it continues to cause him problems. ECF 83, at 9.

C.    **State Defendants' Response**

Defendants set forth a different version of events. On November 29, 2019, at approximately 9:30 a.m., Defendant Frantz was conducting feed on the bottom tier of the D Wing in Housing Unit 1 at NBCI. ECF 111-1, at 4. The medical department previously submitted orders for Plaintiff to receive a cardiovascular diet with no egg. *Id.* According to Defendants, Plaintiff tried to explain to Frantz that he did not receive the correct meal during the feed time. *Id.* Defendant Frantz maintains that Plaintiff would not remove his arm from the feed up slot creating a security breach. *Id.* Plaintiff allegedly threatened Frantz and then Frantz "pepper-sprayed

Plaintiff causing Plaintiff to remove his arm from the feed up slot allowing Defendant Frantz to secure Plaintiff's cell." *Id.* (citing ECF 111-2, at 109–10).

Frantz then immediately radioed for assistance and Thomas responded. ECF 111-1, at 4 (citations omitted).  According to Defendants, Plaintiff "initially refused to follow Defendant Thomas' orders but complied once Plaintiff was informed Defendant Thomas was taking Plaintiff to medical." *Id.* at 4–5 (citing ECF 111-4 (Thomas Decl.), at 1.  While escorting Plaintiff to the room, Plaintiff allegedly "began shaking his head causing bodily fluid to land on Defendant Thomas." *Id.* at 5 (citing ECF 111-4, at 1 and ECF 83, at 5).  Defendants contend that Thomas and Frantz "stopped the escort, Defendant Thomas gave Plaintiff direct orders to stop, and Defendant Thomas positioned himself behind Plaintiff for the remainder of the escort." *Id.* (citing ECF 111-4, at 1 and ECF 111-2, at 122).  Dolly "witnessed what happened and joined [] Thomas and Frantz to assist escorting Plaintiff to medical." *Id.* (citing ECF 111-5 (Dolly Dep.), at 103).  Plaintiff was "compliant the remainder of the escort to medical." *Id.* (citing ECF 111-4, at 1).

According to Defendants, Beeman was "present in the medical exam room when [they] arrived with Plaintiff," and Plaintiff was seated on the medical exam table.  ECF 111-1, at 5.  Before the examination could begin, Plaintiff allegedly "made hocking noises and spat on [Thomas]." *Id.* (citing ECF 111-4, at 1–2, ECF 111-5, at 108, ECF 111-6, at 85–86).  Thomas alleges that he then "spontaneously punched Plaintiff one time out of self-defense." *Id.* (citing ECF 111-4, at 2).

After Thomas struck Plaintiff, the Defendants "forced Plaintiff backwards on the medical exam table to subdue Plaintiff and prevent any further assault by Plaintiff." ECF 111-1, at 6 (citing ECF 111-4, at 2).  Defendants assert that Plaintiff refused medical attention and continued to "act belligerent forcing Defendant Dolly to tighten his hold on Plaintiff's arm." *Id.* (citing ECF 111-5,

at 135). Thomas then radioed for leg irons, which were delivered to the medical exam room and secured on Plaintiff. *Id.* (citing ECF 111-4, at 2). Plaintiff was then put in a strip cage for an "extended cool down period." *Id.* (citing ECF 111-4, at 2). Defendants maintain that Plaintiff did not lose consciousness in the medical exam room. *Id.* (citing ECF 111-4, at 2, ECF 111-5, at 154, ECF 111-6, at 90). After the "extended cool down period," Beeman allegedly evaluated Plaintiff and "cleared" him. *Id.*; ECF 115-1, at 8. Plaintiff was then escorted to a new cell. ECF 111-1, at 6; *see also* ECF 115-3, at 20.

Defendants state that Plaintiff was taken to Western Maryland Regional Medical Center for a rape kit after making a "false claim of sexual assault against Thomas." ECF 111-1, at 6; ECF 111-6, at 167–69. Plaintiff apparently "denied having any sexual assault injuries and refused a rape kit." ECF 111-1, at 6; ECF 111-6, at 169–70. However, while at the medical center, Plaintiff was given a CT scan, which revealed a displaced right zygomaticomaxillary complex fracture. ECF 111-1, at 6; ECF 115-6, at 3. Plaintiff's discharge paperwork "encouraged outpatient follow-up for Plaintiff's maxillofacial injury." ECF 111-1, at 6; ECF 111-6, at 173.

Defendants argue that in Plaintiff's Administrative Remedy Procedure ("ARP") complaint, he alleges conduct by Thomas and Beeman only, not Dolly or Frantz. ECF 111-1, at 6–7 (citation omitted). Defendants also allege that Plaintiff makes no mention in the ARP complaint of being unconscious because of Thomas's alleged actions. *Id.* at 7.

Defendants also assert that the two affidavits submitted by Plaintiff from incarcerated individuals Robert Turner and Frank Thodos claiming that they saw the incident are "verbatim." ECF 111-1, at 7 (citing ECF 25, at 18–21). Defendants state that Turner was transferred to another institution on September 6, 2019, and remained there until June 18, 2020. *Id.* (citing ECF 111-8, at 2–3). Accordingly, Defendants maintain that Turner could not have seen the events of

November 29, 2019. *Id.* Defendants also observe that Plaintiff was taken to a new cell on the C tier of Housing Unit 1 after the incident and thus, according to Defendants, "Thodos could not have seen Plaintiff's face or shirt from his cell on the D Tier immediately after the events on November 29, 2019." *Id.*

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 603 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson,* 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court "may not make credibility

10

determinations or weigh the evidence." *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). The role of the court is "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.   ANALYSIS

Plaintiff alleges that the Defendants violated his Eighth and Fourteenth Amendment rights. Defendants make four arguments in support of their motion for summary judgment: 1) the Eleventh Amendment bars suit against the State Defendants in their official capacity; 2) Plaintiff has failed to state a claim for excessive force against the State Defendants; 3) Plaintiff has failed to establish an Eighth Amendment claim for denial of medical care; 4) Defendants are entitled to qualified immunity in their individual capacities.[5] *See generally* ECF 111. Plaintiff responds with

---

[5] Defendants initially claimed that the Prison Litigation Reform Act (PLRA) barred suit against Dolly and Frantz because Plaintiff failed to properly exhaust administrative remedies. ECF 111-1, at 11. However, Defendants withdrew this argument in their Reply brief. ECF 118, at 6. As such, the Court will evaluate Plaintiff's claims as though they have been fully exhausted.

four arguments of his own: 1) Plaintiff's suit against the State Defendants in their individual capacities is not barred by the Eleventh Amendment; 2) State Defendants used excessive force against Plaintiff in violation of Plaintiff's constitutional rights; 3) State Defendants are jointly and severally liable with the Medical Defendants for the injury to Plaintiff they combined to cause; 4) State Defendants are not entitled to qualified immunity. *See generally* ECF 115.

For the reasons stated below, Defendants' motion for summary judgment is denied.

**A.    The Eleventh Amendment Does Not Bar Suit Against the Defendants Because They are Being Sued in their Individual Capacities.**

"[W]hile officials sued in their personal capacities are 'persons' under § 1983, state officials sued in their official capacities are not."[6] *Victors v. Kronmiller*, 553 F. Supp. 2d 533, 544 (D. Md. 2008). Defendants argue that Plaintiff's Second Amended Complaint "purportedly takes issue with the State Defendants' actions in performance with their official duties and actions 'under color of state law,' and [Plaintiff's] intent is apparently to assert claims against these [] correctional officers in their official capacities." ECF 111-1, at 10–11 (internal citations omitted). According to Defendants, they are "immune from suit in federal court in their official capacities," and thus entitled to summary judgment. *Id.* at 11. Plaintiff responds that the action is "self-evidently one for damages under 42 U.S.C § 1983 against the individual defendants for their violations of Mr. Anderson's constitutional rights while acting under color of state law." ECF 115, at 20–21 (citations omitted).

---

[6] Section 1983 "is not an independent source of substantive rights, but simply a vehicle for vindicating preexisting constitutional and statutory rights." *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). To prevail, Plaintiff must prove that the charged state actor (1) deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was performed under color of state law as outline in the statute. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970); *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001).

"To establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Haver v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). In contrast, "more is required in an official-capacity action . . . the entity's 'policy or custom' must have played a part in the violation of federal law." *Victors*, 553 F. Supp. 2d at 544 (citing *Graham*, 473 U.S. at 166). When a plaintiff does not allege capacity specifically, the court must examine "the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." *Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995). "One factor indicating that suit has been filed in such a manner might be the plaintiff's failure to allege that the defendant acted in accordance with a governmental policy or custom, or the lack of indicia of such a policy or custom on the face of the complaint." *Id.* (citing *Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir. 1991) and *Conner v. Reinhard*, 847 F.2d 384, 394 n. 8 (7th Cir. 1988)). Another indication that suit has been brought against a state actor in their personal capacity may be plaintiff's request for compensatory or punitive damages since such relief is unavailable in official capacity suits. *Biggs,* 66 F.3d at 61 (citations omitted). Further, the nature of any defenses raised in response to the complaint is an additional relevant factor. *Id.*

Here, the conduct alleged involves the Defendants' individual actions and does not allude to an official policy or custom that would shield them from individual culpability. In fact, the crux of Plaintiff's claims are that Defendants violated the prison's use of force practices and procedures and medical treatment guidelines. Moreover, Plaintiff's lawsuit seeks compensatory damages, which provides additional support for a personal capacity suit, because that form of relief is unavailable in official capacity suits. *Biggs*, 66 F.3d at 61. Defendants' assertion of qualified immunity also provides some evidence of a personal capacity suit because such a defense is

unavailable in official capacity claims. *See id.* ("Because qualified immunity is available only in a personal capacity suit, the assertion of that defense indicates that the defendant interpreted the plaintiff's action as being against him personally.") (citations omitted). However, this factor is accorded less weight because the Defendants also raised the issue of Eleventh Amendment immunity. *See id.* ("On the other hand, the defendants also raised the issue of Eleventh Amendment immunity, so this factor is accorded less weight than otherwise would be the case."); *Victors*, 553 F. Supp. 2d at 545. Nevertheless, the Court finds that, considering the *Biggs* factors, Plaintiff sued State Defendants in their personal capacities. Accordingly, the Eleventh Amendment does not bar suit and summary judgment is denied as to this claim.

### B. There are Genuine Disputes of Material Fact as to Plaintiff's Excessive Force Claim.

There are genuine disputes of material fact concerning the need for force, the amount of force used, and the reasonableness of the force. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition protects against inhumane treatment and conditions while imprisoned. *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The Eighth Amendment is violated when an incarcerated individual is subjected to "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). To establish an Eighth Amendment violation, Plaintiff must establish both that the prison official subjectively "acted with a sufficiently culpable state of mind" and that the injury or deprivation inflicted was objectively serious enough to constitute a violation. *Williams*, 77 F.3d at 761.

The objective component of an excessive force claim has a low threshold. *See Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010). "[D]e minimis or trivial force is not enough, but anything more will suffice." *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021). On the subjective element,

14

the Plaintiff must show that the defendants used force "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). In assessing this element, a court should consider the following non-exhaustive factors: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (quoting *Whitley*, 475 U.S. at 321) (quotation marks omitted).

There is a dispute over virtually every fact regarding what took place in the medical room on November 29, 2019. . Plaintiff denies that he spit on or at anyone, ECF 115-2, at 3, while Thomas insists that Plaintiff spit "directly in [his] face." ECF 111-4, at 2. Plaintiff asserts that as he entered the medical room in handcuffs, he was "trying to tell Nurse Beeman what happened" when Thomas started "punching [him] in the face with tremendous force." ECF 115-1, at 7. Defendants contend that Plaintiff "intentionally hit [] Thomas with bodily fluids and was fighting back as the State Defendants attempted to gain control of the situation." ECF 118, at 7; *see also* ECF 111-4, at 1–2; ECF 111-6, at 92. Moreover, Plaintiff asserts that Thomas punched him "multiple times with his gloved hand" while Frantz and Dolly held him down, and believes he was eventually "knocked unconscious," ECF 115-1, at 7, while the State Defendants maintain that Thomas "spontaneously punched Plaintiff one time out of self-defense," and Plaintiff "at no time . . . los[t] consciousness." ECF 111-1, at 5, 6 (citing ECF 111-4, at 2). Thus, there are clearly material disputes of fact as to the amount of force used and the justification for the use of force. The *Whitley* factors illustrate that the amount of force and the justification for the use of force are

central in determining whether Defendants' actions are constitutional, thus summary judgment must be denied.[7]

Additionally, Plaintiff argues that he is entitled to have the jury decide "whether punching an inmate's face hard enough to break his cheek bone in multiple places, while he is handcuffed and defenseless, serves any legitimate correctional purpose or, rather, constitutes constitutionally impermissible punishment." ECF 115, at 29. In reply, Defendants assert that Thomas's "spontaneous reaction to an assault with bodily fluids does not imply malicious intent." ECF 118, at 7. The Court finds that whether Defendants acted with a sufficiently culpable state of mind presents an issue of fact for the jury. Indeed, as Plaintiff points out, the "'need for the use of force in this degree' is not 'so self-evident that no reasonable jury could infer a malicious motive.'" ECF 115, at 30 (citing *Brooks v. Johnson*, 924 F.3d 104, 116 (4th Cir. 2019)). In fact, when interpreting the facts in the light most favorable to Plaintiff, the evidence demonstrates that Thomas repeatedly punched Plaintiff in the face while Dolly and Frantz held him down, resulting in a displaced right zygomaticomaxillary complex fracture, bleeding, and loss of consciousness. ECF 111-6, at 116;

---

[7] As an additional note, Defendants generally argue throughout their motion that "[d]iscovery has not provided any evidence to support Plaintiff's mere accusations that Defendant Thomas assaulted Plaintiff unprovoked and out of malice," and that "[t]he only statements, other than Plaintiff's conclusory allegations, are affidavits from incarcerated individuals that could not have possibly witnessed the events at issue in this action." ECF 111-1, at 16–17. However, the Court finds that Plaintiff offers ample evidence outside of his own allegations, including contemporaneous incident reports, deposition testimony, medical records, photographs of his injuries, prison policy directives addressing permissible uses of force, contradictory statements by the State Defendants, and the opinions of Plaintiff's expert. Plaintiff also explicitly states that he is "not relying on [the incarcerated individuals'] declarations in any way to oppose the Motion." ECF 115, at 7 n. 1. And in any event, "[t]estimony by a plaintiff of events of which he has personal knowledge is sufficient to overcome summary judgment." *Murray v. Lilly*, 426 F. Supp. 3d 245, 252 (S.D.W. Va. Sept. 26, 2019). This is especially true here, as in *Murray*, because it is "difficult to imagine what other evidence besides his own testimony [Plaintiff] could offer to show his version of the key events, as there were no witnesses other than the Defendants to the use of force" in the medical room. *Id.*

ECF 115-6, at 3; ECF 115-8, at 9. The Defendants did this while Plaintiff was allegedly handcuffed, unable to attack any officer, and attempting to recover from the effects of being pepper-sprayed. ECF 115-1, at 6; ECF 111-5, at 117–18; ECF 111-6, at 116. These facts create a reasonable inference that the Defendants inflicted force on Plaintiff to punish him, for the sole purpose of causing him pain—conduct that satisfies the subjective component of an Eighth Amendment violation. *See Dean*, 984 F.3d at 304 (reversing district court's grant of summary judgment to defendants because "when officers [] use force [] against a formerly recalcitrant inmate after he has been subdued, then a reasonable jury may infer that the force was applied not for protective reasons but instead to retaliate or punish"); *see also Brooks*, 924 F.3d at 116 (holding that improper motive could be inferred in part from fact that inmate was subjected to taser shocks while "handcuffed and surrounded by officers"). Accordingly, the Court cannot hold as a matter of law that the circumstances do not imply malicious intent.

### C. There are Genuine Disputes of Material Fact as to the Denial of Medical Care Claim.

"In order for an individual to be liable under § 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Plaintiff asserts that while the State Defendants are not medical providers, they are "jointly and severally liable for the injury that their excessive force caused, including the consequences of the failure of medical-care providers to provide timely and appropriate treatment to Mr. Anderson's fractured face." ECF 115, at 31. Defendants aver that

there is "no evidence to support Plaintiff's conspiracy theories that these State Defendants personally provided Plaintiff with medical care, personally interfered with Plaintiff's medical care, had any supervisory authority over the private medical care providers for purposes of determining Plaintiff's course of treatment, or conspired with the Medical Defendants to deny any specific course of treatment to Plaintiff." ECF 118, at 9. According to Defendants, they "were not personally involved [in the alleged denial of medical care] and therefore not deliberately indifferent to Plaintiff's serious medical needs." *Id.* at 10.

As an initial matter, the Court notes that Plaintiff's claim that the State Defendants are "jointly and severally liable for the injury that their excessive force caused, including the consequences of the failure of medical-care providers to provide timely and appropriate treatment to Mr. Anderson's fractured face," ECF 115, at 31, informs the damages inquiry, not the question of threshold liability. *See Harper v. Albert*, 400 F.3d 1052, 1062 (7th Cir. 2005) (explaining that joint and several liability is applicable in the § 1983 context only after all defendants have been found liable for concurrently violating plaintiff's constitutional rights); *Barnard v. Piedmont Regional Jail Auth.*, No. 07-cv-566, 2009 WL 2872510, at *11 (E.D. Va. Sept. 3, 2009) (finding defendants jointly and severally liable because the evidence showed that each defendant "personally took part in the assault"). As such, Defendants are correct to point out that "the legal authority cited by Plaintiff to support their contention is in reference to apportioning damages *after* defendants have been found liable for violating a prisoner's constitutional rights." ECF 118, at 8 (emphasis in original). "Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation." *Pevia v. Hogan*, 443 F. Supp. 3d 612, 630 (D. Md. 2020) (citations omitted). Thus, the inquiry here is whether, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that each State Defendant violated

18

Plaintiff's Eighth Amendment rights by acting with deliberate indifference to Plaintiff's serious medical need.

In order to state a constitutional claim for denial of adequate medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko*, 535 F.3d at 241. The deliberate indifference standard is analyzed under a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 97–98 (4th Cir. 2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 837–38 (1994)). Objectively, the plaintiff must prove a "'deprivation of a basic human need' that is 'sufficiently serious.'" *Moskos v. Hardee*, 24 F.4th 289, 298 (4th Cir. 2022) (citation omitted). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). The subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.,* with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297–98 (1991); *Farmer*, 511 U.S. at 839–40; *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Rich v. Bruce*, 129 F.3d 336, 340 n. 2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also

19

that the conduct is inappropriate in light of that risk."). A prison official's "failure to respond to an inmate's known medical needs raises an inference of deliberate indifference to those needs." *Scinto*, 841 F.3d at 226. "It is beyond debate that a 'prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.'" *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (citation omitted).

Plaintiff contends that "[a]fter Plaintiff was beaten by Defendants Thomas, Frantz, and Dolly, it was obvious to them and to Nurse Beeman and Nurse Practitioner Hoover that Plaintiff was seriously injured and required medical treatment." ECF 83, at 15–16. The State Defendants "concede that Plaintiff's displaced right zygomaticomaxillary complex fracture satisfies the pleading requirement for an objectively serious medical condition." ECF 111-1, at 18. As such, the objective requirement is satisfied. The Eighth Amendment analysis thus hinges on whether the State Defendants knew of and disregarded a substantial risk to Plaintiff's health and safety. As discussed below, there are material disputes of fact that preclude summary judgment on this claim.

It is worth noting at the outset that Plaintiff does not plead a conspiracy claim in his Second Amended Complaint. *See* ECF 83. Rather, Plaintiff invokes his belief that the Defendants conspired to cover-up the incident as overarching support for his excessive force and denial of medical care claims. The Court finds that the State Defendants' alleged denial of medical care could be a result of an explicit agreement to cover-up what happened in the medical room by refusing or delaying necessary treatment. Thus, the Court analyzes the facts related to an alleged cover-up insofar as they bear on whether a jury could reasonably find that State Defendants acted with deliberate indifference to Plaintiff's medical needs.

Plaintiff alleges that State Defendants "falsely claim[ed] that Plaintiff refused medical care in the aftermath of the beating[,] fail[ed] to allow or [] conduct a thorough medical evaluation or

examination or send Plaintiff out for necessary surgical evaluation and treatment, and fail[ed] to do anything to document or report what happened in the medical room." ECF 83, at 13–14. According to Plaintiff, all of the Defendants "knew that a proper medical evaluation would readily reveal the savagery of the beating they gave him[,] therefore [they] conspired and agreed among themselves to avoid medical care and to cover up the need for medical care." ECF 83, at 15–16.

Defendants, on the other hand, maintain that Plaintiff was seen by Defendant Beeman on the day of the incident, that Plaintiff "only exhibited slight marking and bruising," and there has been "no evidence or testimony provided during discovery that the State Defendants told Nurse Beeman to do or not do anything as Plaintiff contends." ECF 118, at 9–10. Further, Defendants allege that there are "no claims that the State Defendants documented Plaintiff's injuries or made any entries into Plaintiff's medical records," or "refused to take Plaintiff to the medical department for evaluation." ECF 111-1, at 20.

Whether, and to what extent, the State Defendants delayed or interfered with Plaintiff's medical care is disputed. What appears to be undisputed, however, is that the State Defendants did not document Plaintiff's injuries after the incident. ECF 115-3 (Use of Force Reports), at 9–19 (making no mention of any injuries, serious or otherwise); ECF 111-3, at 95–96 (testimony by Thomas indicating that he was supposed to take photographs of Plaintiff's face after the use of force, and he tried "probably once," but Plaintiff "would no[t] allow it"); ECF 115-9, at 4–5 (incident report states "no inmate injuries noted"). Any inference to be drawn from the failure to document injuries is a matter for the jury, given that Defendants assert that this is evidence of lack of personal involvement in administering medical care, while Plaintiff maintains this was part of the State and Medical Defendants' attempt to "cover-up what happened in the medical room, and

that one component of that cover-up consisted of ignoring [Plaintiff's] need for medical care." [8]

ECF 115, at 32; *see Ireland v. Moyer*, Civ No. GJH-17-3061, 2019 WL 1331097, at *8 (D. Md. Mar. 22, 2019) (denying summary judgment for officer defendants on denial of medical care claim because, while defendants affirmed that they did not delay, hinder, or interfere with plaintiff's receipt of medical care, plaintiff alleged that defendants "mocked him when he requested medical care, delayed his transport to the medical unit, and then interfered with the care provided by medical staff," which created a genuine dispute of material fact).

---

[8] Importantly, the Court finds that this is a matter for the jury because Plaintiff's claim that the Defendants personally denied him medical care by conspiring to cover-up the incident is supported by record evidence demonstrating that there were strict protocols in place to document use of force by staff on an inmate and that Defendants did not follow such protocols. *See, e.g.*, ECF 115-5, at 22, 25 (Johns stating that he "can't explain why [he] didn't" list the swollen right eye in the injury section of the Serious Incident Report and confirming that the Use of Force manual requires officers to include the level of injury to the inmate in reports after use of force is deployed); ECF 111-6, at 115–18, 127 (Beeman testifying that he "should have" reported the incident, and is "not sure" why he did not and confirming that when filling out the refusal of medical care form, he did not indicate that Plaintiff had been punched in the face); ECF 111-5, at 195–197 (Dolly stating that it "look[ed] like someone tried to take a photograph of [Plaintiff,]" to conform with procedure, but he is "not sure what happened there"). The documents themselves, *i.e.*, the Use of Force reports and Serious Incident Report, also reflect the failure to document any injuries. ECF 115-3, at 9–19 (making no mention of any injuries); ECF 115-9, at 4–5 (stating "no inmate injuries noted"). Additionally, it is beyond dispute that Plaintiff suffered a serious facial injury, given that an outside medical provider documented fractured facial bones in Plaintiff's medical records several days later, ECF 115-6, at 3, Beeman confirmed that follow-up treatment was required, ECF 111-6, at 173, and Defendants conceded that Plaintiff's facial injuries satisfy "the pleading requirement for an objectively serious medical condition." ECF 111-1, at 18. In other words, this is not a case where prison records correctly reflect lack of injury to an inmate after the deployment of force. Rather, Plaintiff suffered serious facial injuries, a fact Defendants do not dispute, yet there is no evidence of such injuries in the State Defendants' contemporaneous reports of the incident. *Cf. Wilson v. Evans*, Civ No. PJM-15-2151, 2017 WL 660801, at *9 (D. Md. Feb. 17, 2017) ("The fact that Plaintiff's concerns have been documented, discussed, [and] followed-up [on], is evidence that there has been no attempt by medical staff or the named Defendants to ignore a serious medical need or to recklessly disregard it."). Under these circumstances, the disputed facts could reasonably give rise to an inference that Defendants withheld medical care in an attempt to cover-up the incident.

22

Plaintiff offers several pieces of circumstantial evidence to demonstrate the existence of an alleged "cover-up." ECF 115, at 17–19. Specifically, Plaintiff offers: 1) "the stated policy in the DPSCS is that correctional officers are not supposed to collaborate in writing reports, but all of the Use of Force reports concerning the events in the medical room use virtually identical language to describe what happened," ECF 115-3, at 12–19; ECF 115-4 (Lichliter Dep.), at 3–4; 2) "none of the after-action Use of Force reports mention that Nurse Beeman was in the medical room," ECF 115-3, at 12–19; ECF 115-5, at 10, 87–91; 3) Nurse Beeman did not report to his supervisor or prison authorities what he saw in the medical room, and no one asked him what he had witnessed," ECF 111-6, at 171; 4) "Nurse Beeman admits he 'should have' reported what he witnessed, but cannot explain why he did not," *id.* at 116–18; 5) Beeman provided deposition testimony that contradicted his prior declaration, *compare id.* at 116 *with* ECF 23-5 (Beeman Decl.), at 1–2 ¶¶ 6–8; 6) "no photographs of Mr. Anderson's face were taken on the day of the incident, even though such photos are required by the Use of Force Procedures Manual, and even though there were opportunities to do so," ECF 115-5, at 14–15, 31–32; 7) "Thomas admits he was supposed to obtain photographs of Mr. Anderson's face after the use of force, but failed to do so," ECF 111-3, at 95–96; 8) "There are inexplicably no images from that camera of Mr. Anderson at any time during the several hours he was in the strip cage," even though Officer Lichliter testified that there should be a camera on the strip cage when a prisoner is in it for an extended period of time, ECF 115-4, at 7; *see also* ECF 111-3, at 103–04; 9) "Nurse Practitioner Holly Hoover [] had an office across the hall from Nurse Beeman and they discussed Mr. Anderson's condition as reflected in the CT scan and his need for further treatment," ECF 111-6, at 172–73; 10) "[T]he records of Mr. Anderson's CT scan and diagnosis at Western Maryland Regional Medical Center were sent to NBCI and reviewed by Nurse Practitioner Hoover, but they were

never uploaded into his electronic medical records," ECF 115-11 (Getachew Dep.), at 3–4; 11)

Plaintiff did not receive the treatment he needed for his facial injuries, ECF 115-2, at 5 ¶ 17; 12)

"Officer Dolly took actions to discourage Mr. Anderson from, or to retaliate against him for,

pursuing his legal claims for what happened in the medical room, including threatening him,

refusing to put in sick call requests, spraying mace on his legal papers, keeping his cell light on,

withholding phone calls, and other kinds of harassment," *id.* at 7 ¶ 23. The proper inferences to

be drawn from these facts are a matter for the jury because the jury, unlike this Court, can weigh

evidence and make credibility determinations.

Whether an alleged cover-up led to the impermissible denial of necessary medical care

hinges on resolution of material fact disputes. While Defendants assert that Plaintiff only exhibited

"slight marking and bruising" on the day of the incident, Plaintiff's expert, Dr. Manson, indicates

that Plaintiff suffered "a high energy injury of the type that would be seen in a high-speed auto

collision, horse kick, or direct hit with a hard ball."[9] ECF 115, at 15 (citing ECF 115-8, at 9). Dr.

Manson also reported that "the injury [Plaintiff] sustained to the area of the glenoid fossa/skull

base and the magnitude of the zygoma injury are entirely consistent with Mr. Anderson's report

of loss of consciousness." *Id.* Plaintiff reported that he was "punched multiple times," lost

consciousness, and was "bleeding out of the right side of [his] nose." ECF 115-1, at 7. To the

extent the jury credits Plaintiff and Plaintiff's expert, a jury could reasonably conclude that

Plaintiff required immediate medical attention, and failing to receive it was a result of the State

Defendants' intentional interference. *See* ECF 115, at 6 (arguing that the State Defendants "tried

---

[9] The Court notes that Plaintiff attached photos of his face taken by different correctional officers as part of a PREA investigation on November 30, 2019, the day after the incident in the medical room. *See* ECF 115-7, at 3–4; ECF 115, at 18, n. 3. Plaintiff's eye is swollen shut and there is significant inflammation and bruising.

to cover up what happened," and the "need for surgical intervention to repair [Plaintiff's] broken face [was] ignored, resulting in his bones healing in the wrong position and permanent pain and disfigurement"). Interpreting the facts in the light most favorable to the non-moving party, Plaintiff was pepper-sprayed, beaten until he was unconscious, and woke up bleeding. ECF 115-1, at 6–7. Thus, there are facts in the record from which a reasonable jury could infer that State Defendants had actual knowledge of a serious medical condition, given that they caused the condition, and substantially disregarded the risk that serious harm would occur in the absence of timely medical treatment.

Additionally, Defendants assert that Beeman eventually evaluated Plaintiff's injuries on the day of the incident, but Plaintiff alleges that Thomas, Frantz, and Dolly "knew that they could rely on Nurse Beeman not to intervene or report their misconduct, to help them cover it up, and to keep quiet about it," and Plaintiff maintains that Beeman "released [him] back to [his] cell with a recommendation of 'provider' follow-up, but without doing a proper evaluation of [his] injuries." ECF 115-2, at 4. Thus, the propriety of the medical evaluation also generates a dispute of material fact. The Court disagrees with the argument that Plaintiff has only provided "conclusory allegations that the State Defendants conspired to withhold adequate medical care." ECF 118, at 9. Plaintiff cites extensive discovery revealing Defendants' repeated failures to follow institutional protocols after the incident, including failing to document Plaintiff's injuries despite being under an obligation to do so, ECF 115-3, at 9–19, ECF 115-5, at 25, ECF 111-6, at 115–18, 127, failing to take photographs of Plaintiff, even though such photographs are required by the Use of Force Procedures Manual, ECF 111-3, at 95–96, ECF 115-5, at 14–15, 31–32, producing use of force reports with "virtually identical" language, ECF 115-3, at 9–19, and failing to have a camera on the strip cage, ECF 115-4, at 7, ECF 111-3, at 103–04. This evidence, along with Beeman's failure

25

to report what he witnessed, ECF 111-6, at 116–18, and his purportedly contradictory statements, *id.* at 87, 116, ECF 23-5, at 1–2 ¶¶ 6–8, creates a question of fact over whether the State Defendants attempted to cover up the incident.[10] Viewing the evidence in the light most favorable to Plaintiff, a jury could find that, as part of this cover-up, State Defendants withheld, delayed, or interfered with necessary medical treatment. *See Krell v. Braightmeyer*, 828 Fed. App'x 155, 159 (4th Cir. 2020) ("[A] plaintiff can maintain a deliberate indifference claim based solely on the theory that the defendant withheld, delayed, or interfered with medical treatment.") (citation omitted).

In sum, Plaintiff alleges facts that, if credited, could reasonably show that all the Defendants acted in concert to unjustifiably delay, if not deny, adequate medical care to Plaintiff. To be clear, this finding rests on a determination that a jury could reasonably conclude that each defendant (state and medical) *personally* knew about and was involved in denying medical care to Plaintiff. *See Iko*, 535 F.3d at 242 (explaining, with respect to a denial of medical care claim, that "officers face liability for *their own* decisions, made while [Plaintiff] was in their charge.") (emphasis in original). The Court agrees with State Defendants' general proposition that they cannot be held responsible for the consequences of the failure of the medical-care providers to provide timely and appropriate treatment." ECF 118, at 8 (citing ECF 115, at 31). However, under the circumstances, a jury could reasonably find that each defendant was personally involved in the cover-up of the incident, which allegedly included denying medical care to Plaintiff to avoid documentation of the severity of the incident. Under these circumstances, the Court cannot hold as a matter of law that the State Defendants were not personally involved in withholding, delaying, interfering, or denying medical care to Plaintiff. *Cf. White v. Thompson*, 639 F. Supp. 3d 613, 624

---

[10] During his deposition, Beeman testified, "I guess I should have reported [the incident]." ECF 111-6, at 118. When asked why he did not, he responded: "I'm not sure why not." *Id.*

(S.D.W. Va. 2022) (granting summary judgment where the record showed Plaintiff received "prompt medical attention after sustaining an injury to her shoulder while in police custody"). A reasonable jury could conclude that the State Defendants acted with deliberate indifference to Plaintiff's medical needs after the incident in the medical room, thus summary judgment is denied as to this claim.

### D.    Disputes of Material Fact Preclude a Finding of Qualified Immunity.

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Under the doctrine of qualified immunity, "[g]overnmental officials performing discretionary functions are shielded from liability for money damages so long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, the court must undertake a two-part inquiry: (1) viewing the facts in the light most favorable to the Plaintiff, the court must determine if there was a constitutional violation; and (2) if so, whether the right violated was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Both questions must be answered in the affirmative for a plaintiff to defeat a motion for summary judgment on qualified immunity grounds. *Henry v. Purnell*, 501 F.3d 374, 377 (4th Cir. 2007) (citing *Batten v. Gomez*, 324 F.3d 288, 293–94 (4th Cir. 2003)).

While qualified immunity should be decided at the earliest possible phase of litigation, disputed factual issues may preclude such a determination until trial. *See, e.g. Burno-Whalen v. Maryland*, Civ. No. GJH-15-564, 2016 WL 1259556, at *5 (D. Md. Mar. 28, 2016) ("[D]isputes of material fact may preclude a finding by the Court about whether qualified immunity applies, and instead convert the inquiry into a question for the trier of fact."); *Gray v. Torres*, Civ. No.

WDQ-08-1380, 2009 WL 2169044, at *2 (D. Md. July 17, 2009) (noting that, in the summary judgment context, "the qualified immunity question can . . . at times require factual determinations respecting disputed aspects of [a defendant's] conduct" and therefore the summary judgment doctrine should not be "skewed from its ordinary operation to give substantive favor to the defense") (alterations in original) (citations omitted). "Where 'a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury.'" *Yates v. Terry*, 817 F.3d 877, 882 n. 2 (4th Cir. 2016) (citing *Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005)).

Whether qualified immunity shields State Defendants from liability in this case depends upon whether the force employed against Plaintiff was excessive. Because the amount of force employed and the justification for the force is genuinely disputed, this Court cannot determine at this stage whether the force was excessive. Defendants contend that "Plaintiff has failed to show that Defendant Thomas' actions were anything more than a spontaneous response to Plaintiff striking Defendant Thomas with bodily fluids." ECF 111-1, at 22. Defendants further argue that there was "no violation of a clearly established constitutional right." *Id.* Plaintiff maintains that "in November of 2019, 'it was clearly established that the Eighth Amendment forbade the unnecessary and wanton infliction of pain against inmates.'" ECF 115, at 32 (citing *Campbell v. Smith*, 406 Fed. App'x 741, 743 (4th Cir. 2010)). Specifically, Plaintiff asserts that "where, as here, an inmate was in handcuffs and restrained by a correctional officer when struck in the face by another correctional officer, qualified immunity does not protect the correctional officers." ECF 115, at 33 (citing *Campbell*, 406 Fed. App'x at 743) (quotations omitted).

28

Whether Defendants are entitled to qualified immunity depends upon the resolution of material fact disputes as to whether the State Defendants used excessive force and acted reasonably during the incident in question. Plaintiff maintains that he did not spit on, or at, anyone in the medical room. ECF 115-2, at 3. Defendants insist that Plaintiff spit directly at Thomas. ECF 111-4, at 2. Plaintiff asserts that he was repeatedly punched in the face by Thomas while Dolly and Frantz held him down, ECF 115-1, at 6–7, while Defendants argue that Thomas spontaneously punched Plaintiff one time "out of self-defense." ECF 111-1, at 5, 6 (citing ECF 111-4, at 2). A reasonable factfinder could conclude that Defendants' actions violated relevant Use of Force policies and practices. In doing so, a "reasonable jury could question and readily reject the need for the amount of force deployed in this situation." *Tserkis v. Balt. Cnty.*, Civ. No. ELH-19-202, 2021 WL 3129325, at *16 (D. Md. July 23, 2021) (citations and quotations omitted). The Court reaches this conclusion when interpreting the facts in the light most favorable to Plaintiff as Plaintiff supports the claim that he was repeatedly punched while handcuffed until he was knocked unconscious while two other defendants held him down. ECF 111-6, at 87–88; ECF 115-8, at 9. In addition, it is possible that even if Plaintiff spit on Thomas in the medical room, as Defendants allege, a jury could nonetheless conclude that punching Plaintiff in the face, even one time, amounts to excessive force, given the availability of spit-masks and the fact Plaintiff was restrained and surrounded by correctional officers. Accordingly, a reasonable factfinder could find that Defendants' conduct constituted constitutionally impermissible excessive force.

On the other hand, a jury may find that the State Defendants did not use excessive force. Specifically, the jury could credit the Defendants' description of the events leading up to the purported "spontaneous punch" and find it reasonable under the circumstances. But Defendants' implicit contention that they acted in an objectively reasonable way relies on crediting Defendants'

version of facts, which are disputed. Although a jury may find one version of the events is more persuasive than the other, the Court cannot, and will not, make such credibility determinations at this stage. *See Anderson*, 477 U.S. at 255. The question of whether qualified immunity applies hinges on determinations to be made by the trier of fact. As such, summary judgment is denied.

With respect to the second inquiry regarding whether the State Defendants violated a clearly established law, the Court finds that "it was clearly established that the Eighth Amendment forbade the unnecessary and wanton infliction of pain against inmates." *Campbell*, 406 Fed. App'x at 743 (internal quotation marks and citations omitted). More specifically, the Fourth Circuit held in *Campbell*, a case with facts similar to those at issue here,[11] that defendants were not entitled to qualified immunity when "based on [Plaintiff's] version of events giving rise to this litigation, he was in handcuffs and restrained by [defendant] when [another defendant] hit him." *Id.* The Court held that "[i]f this version of events is accepted, a trier of fact could easily conclude that an Eighth Amendment violation occurred." *Id.* If it was clearly established in June 2008 that an officer could not maliciously impose this type of physical violence on a custodial, handcuffed, non-resistant inmate, it remained clearly established in November 2019 as well. Accordingly, if there is a constitutional violation, that violation was clearly established at the time of the incident.

As to qualified immunity for Plaintiff's claim of deliberate indifference to his serious medical needs, Defendants assert that Plaintiff has not established a constitutional violation. ECF 118, at 10. Specifically, Defendants aver that "Plaintiff has failed to establish Plaintiff suffered a denial of medical care at the hands of the State Defendants." *Id.* As discussed at length above,

---

[11] In *Campbell v. Smith*, Campbell claimed that Defendants Smith and McClinen used excessive force against him when Smith sprayed him with tear gas following a verbal altercation and later hit him in the face while McClinen restrained him, even though he was handcuffed at the time. 406 Fed. App'x at 742.

there are material fact disputes regarding whether the State Defendants conspired with the Medical

Defendants to cover-up the incident and withhold necessary medical care. *See Epperson v. Smith*,

836 Fed. App'x 127, 130 (4th Cir. 2020) (upholding district court's denial of summary judgment

where fact disputes precluded summary judgment in favor of officials on issue of qualified

immunity); *Mabrey v. Farthing*, 280 F.3d 400, 402 (4th Cir. 2002) ("There being issues of disputed

fact upon which a qualified immunity defense might depend, the district court correctly concluded

that the qualified immunity defense was not then available for that reason, not that it is precluded

later.") (citation omitted).  Plaintiff offers evidence that, taken together, gives rise to a reasonable

inference that the alleged denial of medical care was a result of State Defendants' personal attempts

to cover up the incident, interfere with the documentation of Plaintiff's injuries, and delay

necessary medical attention to treat his injuries. *See* ECF 115, at 17–19.  A reasonable jury could

find that this satisfies deliberate indifference under the Eighth Amendment.  On the other hand, a

jury may be persuaded by Defendants' assertions that they did not "personally provide[] Plaintiff

with medical care, personally interfere[] with Plaintiff's medical care, ha[ve] any supervisory

authority over the private medical care providers for purposes of determining Plaintiff's course of

treatment, or conspire[] with the Medical Defendants to deny any specific course of treatment to

Plaintiff." ECF 118, at 9.  The former conclusion may yield a constitutional violation; the latter

may not.

On the present record, there are facts from which a reasonable jury could infer State

Defendants intentionally interfered with and withheld medical care to Plaintiff, thereby acting

deliberately indifferent to Plaintiff's undisputed serious medical need. *Sharpe v. S.C. Dep't of

Corr.*, 621 F. App'x 732, 733 (4th Cir. 2015) ("[O]fficials evince deliberate indifference by acting

intentionally to delay or deny the prisoner access to adequate medical care or by ignoring an

inmate's known serious medical needs."). To the extent the jury makes such a finding, the resulting constitutional violation was clearly established at the time of the incident. It is beyond dispute that "a prisoner has a constitutional right to the medical care necessary to address his serious medical needs." *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018). As such, "[a] prisoner's right to adequate medical care and freedom from deliberate indifference to medical needs has been clearly established by the Supreme Court and th[e] [Fourth] Circuit since at least 1976 and, thus, was clearly established at the time of the events in question." *Scinto*, 841 F.3d at 236. Thus, to the extent there was a constitutional violation, which depends upon the resolution of disputed facts, such a violation was clearly established at the time of the incident. Accordingly, because the constitutional violation prong of the qualified immunity analysis hinges on factual determinations, summary judgment must be denied.

## IV.    **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment, ECF 111, is **DENIED**. A separate implementing Order will issue.

Dated: <u>December 6, 2024</u>

_____/s/_____
Brendan A. Hurson
United States District Judge
